# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY MARTINEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:12-cv-01101-SAB<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER DEVELOPMENT OF THE RECORD<br><br>(ECF Nos. 15, 18, 19) |

## I.

## INTRODUCTION

Plaintiff Jeffrey Martinez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from diabetes mellitus, left leg amputation, and depressive disorder. For the reasons set forth below, Plaintiff's Social Security appeal shall be granted in part and denied in part; and this action shall be remanded to the Commissioner for further proceedings consistent

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 9,10.)

1

with this opinion.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on September 10, 2007, and a Title XVI application for supplemental security income on September 30, 2007. (AR 110.) Plaintiff's applications were initially denied on January 11, 2008, and denied upon reconsideration on August 8, 2008. (AR 127-30; 136-40.) Plaintiff requested and received a hearing before Administrative Law Judge James Berry ("the ALJ"), which took place on January 13, 2010. (AR 58-81.) On May 13, 2010, the ALJ found that Plaintiff was not disabled. (AR 108-18.) The Appeals Council remanded for a hearing for the ALJ to consider records regarding Plaintiff's leg amputation, which took place on February 17, 2011. (AR 123-26; 28-57.) On March 14, 2011, the ALJ found that Plaintiff was not disabled. (AR 11-22.) The Appeals Council declined Plaintiff's request for review on November 10, 2011. (AR 1-3.)

### A. January 13, 2010 Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at the hearing. (AR 62-76.) On the date of the hearing, Plaintiff was forty-two years old. (AR 62.) Plaintiff has an Associate of Arts degree in Accounting. (AR 62.) Plaintiff last worked in 2006 doing basic janitorial work. (AR 62.) Prior to that, Plaintiff worked for about a year for a temporary agency doing various assignments, mainly accounting work. (AR 63.) Plaintiff worked for several years doing payroll for a concrete company. (AR 63-64.) Plaintiff was a senior account manager for a marketing promotional firm. (AR 64.)

Plaintiff lives with his mother and nephew. (AR 70.) Plaintiff's mother has multiple myeloma cancer and is pretty much incapacitated. (AR 73.) She is able to walk and can take of her personal needs. (AR 76.) Plaintiff drives her around. (AR 73.) Prior to his amputation, Plaintiff was his mother's caregiver. (AR 73.) Plaintiff drives his mother to doctor's appointments and runs errands for her. (AR 76.)

Since the amputation, Plaintiff is not doing any housework. (AR 70.) Plaintiff does the

dishes by putting hot water in the sink and letting them soak so the soap does all the work.  (AR 71.)  It can take Plaintiff about an hour to do the dishes when it used to take him about five minutes.  (AR 71.)  Plaintiff can only do the dishes for about three minutes and then he needs to sit down because his foot will get numb and he needs to get the circulation going again.  (AR 71.)  Plaintiff just started doing laundry again.  (AR 71.)  Plaintiff is able to drive a car, but is unable to vacuum, mop, sweep, or cook.  (AR 71.)

Plaintiff spends his day reading the newspaper, but rarely gets on the computer.  (AR 72.)  Sometimes he will go for months without checking his e-mail.  (AR 72.)  Plaintiff gets lower back pain and has to get out of his wheelchair and lie down.  (AR 72.)  Recently the lower back pains became a sharp pain, similar to the pain in his hands and feet.  (AR 72.)  Plaintiff has not seen the doctor about the back pain.  (AR 72.)

Plaintiff is unable to work due to pain in his hands and feet and stress.  (AR 64.)  Plaintiff has sharp shooting pain in his hands and feet from his diabetes.  (AR 65.)  Plaintiff got a sore on his left foot which became gangrenous and his left foot was amputated on May 4, 2009.  (AR 65.)  Plaintiff was to get a prosthesis after the amputation, but the insurance companies were debating who would cover the cost.  (AR 65.)  Plaintiff has numbness and shooting pain, like needles stabbing him in his right foot.  (AR 66.)  Plaintiff frequently has to elevate his leg, about four to six hours per day, to help the circulation.  (AR 66.)  Plaintiff uses a wheelchair and is able to walk about fifteen feet with crutches.  (AR 66.)  Plaintiff is able to stand for five to ten minutes.  (AR 66.)

Plaintiff also has pain in his hands and they frequently cramp.  (AR 66.)  Plaintiff can use a computer for ten to twenty minutes before his hands begin to cramp and become painful.  (AR 67.)  Plaintiff's eyes hurt as well and he cannot stare at the computer monitor for very long.  (AR 67.)  Every now and then, Plaintiff will lose grip strength.  (AR 67.)  Plaintiff is able to lift about forty pounds.  (AR 67.)  Plaintiff is able to sit in his wheelchair for one half to one hour in an eight hour day.  (AR 74.)

During the day, Plaintiff lays down about four to six hours to elevate his leg and wiggle his toes to get the circulation going.  (AR 68.)  Plaintiff becomes lightheaded and feels faint four

1  to five times per month. (AR 68.) Plaintiff is not receiving any mental health treatment. (AR
2  68.) Plaintiff was seeing a psychiatrist at Merced County, but they did not "hit it off" so he
3  stopped going. (AR 69.) Plaintiff is able to carry fifteen pounds. (AR 74.) Plaintiff is able to
4  stand with the assistance of crutches or a walker for four minutes. (AR 74-75.) Plaintiff was to
5  see the doctor the following month regarding obtaining a prosthetic leg. (AR 75.)

6        Plaintiff is taking Neurontin and Vicodin for pain. (AR 68.) Plaintiff takes twelve
7  medications in the morning. (AR 69.) Sometimes Plaintiff's medications cause him to have
8  stomach cramps. (AR 68.) Plaintiff takes Wellbutrin for depression. (AR 69.) Plaintiff's
9  medications are helping him; his blood sugars have come down and are fairly in the normal range.
10 (AR 73.)

11       Plaintiff does not socialize with people outside of his family very often. (AR 69.)
12 Plaintiff has two friends since high school and has met most of his acquaintances through them or
13 when he was working. (AR 69.) Plaintiff does not like going to malls or places that are crowded
14 and stays home for the most part. (AR 69.) He gets nervous and sweaty so Plaintiff stays away
15 from crowded places. (AR 69.)

16       Plaintiff feels a sadness, as if he is ready to cry. (AR 69.) He finds it hard to do things or
17 even get motivated to take care of himself. (AR 69.) Plaintiff gets stuck on one thought
18 throughout the day, and gets sidetracked often and quickly. (AR 70.)

19       2.    <u>Vocational Expert Testimony</u>

20       Ms. Najarian, a vocational expert ("VE"), also testified at the hearing. (AR 77-80.) Ms.
21 Najarian characterized Plaintiff's prior work as a payroll clerk, sedentary and semi-skilled;
22 janitor, medium and unskilled; account clerk, sedentary and skilled; and bookkeeper, sedentary
23 and skilled. (AR 77.) The VE was presented with a hypothetical of an individual of Plaintiff's
24 age, education, and work experience with a combination of severe impairments; can lift and carry
25 twenty pounds occasionally and ten pounds frequently; can stand and walk two hours and sit six
26 hours; and must avoid concentrated exposure to unprotected heights and uneven terrain. (AR 78.)
27 The VE opined that this individual could not work as a janitor, but could perform Plaintiff's other
28 prior jobs. (AR 78.)

The VE was presented with a second hypothetical, with a person as described above, however the individual could lift a maximum of forty pounds and carry fifteen pounds; could sit one to one and one half hours; could walk fifteen feet and stand for four minutes; requires an assistive device for walking; has difficulty interacting or relating to others and maintaining concentration; has difficulty using his hands for more than ten to twenty minutes at a time; and must elevate his right lower extremity for to six hours per day. (AR 78-79.) The VE opined that this individual could not perform Plaintiff's prior jobs or any other job in the national economy. (AR 79.)

Plaintiff's attorney presented a hypothetical of an individual with the same vocational background as Plaintiff; ability to understand and remember and follow short and simple instructions is good; ability to maintain appropriate level of concentration, pace and persistence necessary to perform a one or two-step simple and repetitive task is fair; ability to relate to others, including co-workers, supervisors, personnel, and the general public is fair; ability to tolerate the usual stresses and pressures associated with day to day work activities is fair; ability to manage changes in routine work situations is fair; and with the same exertional limitations as described in hypothetical one. (AR 79-80.) The VE opined that this individual would be able to work, however the information provided does not provide enough information to determine if he would be limited to Specific Vocational Preparation 1 and 2 jobs. (AR 80.)

**B.     February 17, 2011 Hearing Testimony**

1.     Plaintiff's Testimony

Plaintiff testified at the hearing on February 17, 2011. (AR 32-49.) Plaintiff is receiving treatment by a nurse practitioner, Krenn, and Dr. Hanger for adjustments to his leg. (AR 32.) Plaintiff goes to the Family Care Center clinic once per month. (AR 35.) Plaintiff has had a couple of infections on his stump in the past year and has a sore on his right foot. (AR 35.) Plaintiff got his prosthesis on May 18, 2010. (AR 41.) It took over a year to get his prosthesis and Plaintiff developed sores from crawling around on his knees. (AR 42.) Plaintiff had to go back to using his wheelchair for two to three months in the summer of 2010. (AR 35, 41.) Plaintiff has had a MRSA infection on his foot. (AR 36.) Plaintiff had to have laser surgery on

his eyes to stop bleeding.  (AR 36.)

Plaintiff is trying to get his blood sugar under control, but it has been out of control lately. (AR 36.)  Plaintiff does not have a blood glucose monitor to check his blood sugar, because when his Medi-Cal changed the new provider wanted him to start using a different monitor.  (AR 36.) Plaintiff liked the prior monitor he was using and his new insurance will not pay for it, so he is fighting them.  (AR 36.)  Plaintiff was taking Metformin and Actos and his blood sugars ranged from 120 to 150 for the last year.  (AR 37.)  Plaintiff's energy level is low and he has anemia. (AR 34, 47.)  Plaintiff had to rest three times during the two to two and one half block walk to the hearing due to being tired and out of breath.  (AR 34, 44.)  On occasion, Plaintiff's blood sugar goes low and he becomes very shaky, has problems with his eyesight, and is unable to move. (AR 34.)  Plaintiff has tablets that he uses which bring his blood sugar back up.  (AR 34-35.)

Plaintiff has phantom pain in his stump two to three times per week.  (AR 37, 38.) Plaintiff is taking Neurontin for the nerve pain, but does not take it during the day because it makes him sleepy.  (AR 38.)  Plaintiff has bowel problems and has to get up during the night and several times during the day.  (AR 40-41.)  He takes Colace which has relieved his symptoms. (AR 41.)   Plaintiff has had several bowel accidents and has stomach cramping twice a week. (AR 41.)

Plaintiff is also receiving counseling at Merced County Mental Health for depression and is taking Prozac for depression and Lyrica for anxiety.  (AR 33, 34.)  Plaintiff went to Mental Health because he was "crying and stuff" because he lost his house and his mom has cancer.  (AR 33.)  Due to his depression Plaintiff is "not able to get going and stuff like that."  (AR 33.)  He does not get prepared as much as he should and he runs behind.  (AR 33.)  Plaintiff describes difficulty concentrating which causes him to read the same thing over and over and he gets easily distracted.  (AR 33.)

Plaintiff gets up about 9:00 in the morning so he can take his mother for a blood test or doctor appointment.  (AR 38.)  There is lots of stuff that needs to get done around the house.  (AR 39.)  If Plaintiff is "not doing that" he will sleep after breakfast or by 1:00 in the afternoon.  (AR 39.)  Lately, Plaintiff naps for two to three hours a day.  (AR 39.)  Plaintiff has been unable to do

6

any housework for the last three months.  (AR 39.)  Prior to that Plaintiff would do the dishes, take out the trash on a daily basis or two to three times a week, depending on how he felt.  (AR 39.)  Plaintiff microwaves his food and does his laundry now and then.  (AR 40.)  Plaintiff's neighbors have been doing his yard work for the year.  (AR 40.)  Plaintiff basically just stays home.  (AR 40.)

It took over a year for Plaintiff to get his prosthesis because he was on a local medical aid program in Merced and they were waiting for him to get on Medi-Cal.  (AR 42.)  Once Plaintiff was on Medi-Cal, they wanted to wait to see if he would qualify for Social Security.  (AR 42.)  Plaintiff's prosthesis is working well, although he had a problem with the clasp and fell.  (AR 43.)  Plaintiff has to be careful the way he walks and use WD-40 on the prosthetic until May when he is eligible for a new prosthetic.  (AR 43.)

Plaintiff is able to stand for about one hour and sit for two to three hours in an eight hour day.  (AR 45.)  When Plaintiff goes to a doctor's office he has to kind of lean back or lay down.  (AR 45.)  Plaintiff lies down for four to five hours during an eight hour day.  (AR 45.)  During the day, Plaintiff naps an hour to a few hours when he is home.  (AR 46.)  Plaintiff is able to lift ten pounds.  (AR 46.)  Prior to getting his prosthesis Plaintiff was able to be on his feet four hours in an eight hour day.  (AR 46.)   Before getting his prosthesis Plaintiff was unable to stand and his walking was inhibited.  (AR 47.)  Plaintiff was using a wheelchair, walking on his knees, or crawling.  (AR 47.)  Between January and May of 2010, Plaintiff was able to lift five pounds and could sit in the wheelchair two hours in an eight hour day.  (AR 48.)

Plaintiff is able to carry five pounds.  (AR 49.)  Plaintiff is drinking less beer than he used to and thinks it is less of a problem.  (AR 49.)

      2.     <u>Vocational Expert's Testimony</u>

Mr. Chaparro, a vocational expert ("VE"), also testified at the hearing.  (AR 49-56.)  The VE was presented with a hypothetical of an individual of Plaintiff's age, education, and work experience; can lift and carry twenty pounds occasionally and ten pounds frequently; can stand and walk four hours and sit six hours; uses a prosthesis to walk; can frequently balance, stoop, kneel, crouch and crawl; cannot climb; and must avoid concentrated exposure to unprotected

heights and uneven terrain. (AR 53.) The individual has the residual functional capacity to perform simple, repetitive tasks; can maintain attention, concentration, persistence, and pace; can relate to and interact with others; can adapt to usual changes in work settings; and can adhere to safety rules. (AR 53.) The VE opined that this individual would not be able to perform Plaintiff's prior work, but would be able to perform light and unskilled work as a ticket taker, toe closing machine tender, and outside deliverer. (AR 54-55.)

The VE was presented with a second hypothetical of an individual with the same vocational parameters and combination of severe impairments who can very rarely lift ten pounds and carry five pounds occasionally; can walk less than two blocks, stand for one hour, and sit for two to three hours at a maximum; uses a cane to assist with walking; requires frequent or ready access to a restroom; and would require unscheduled breaks lasting two to four hours per day. (AR 55-56.) The VE opined that there would be no jobs available for an individual with these limitations. (AR 56.)

### C. ALJ Findings

In the decision at issue here, the ALJ found that Plaintiff has severe impairments of diabetes mellitus, left leg amputation, and depressive disorder. (AR 16.) Plaintiff impairments do not meet or medically equal one of the listed impairments. (AR 17.) Plaintiff's residual functional capacity allows him to

> lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 4 hours with the use of a prosthesis to assist in walking; and sit for 6 hours in an 8-hour day. He can frequently balance, stoop, kneel, crouch, or crawl; and cannot climb. He must avoid concentrated exposure to damp and cold environments. He can perform simple, repetitive tasks; maintain concentration, attention, persistence, and pace; relate to and interact with others; adapt to usual changes in work settings; and adhere to safety rules.

(AR 18.) There are jobs that exist in the national economy that Plaintiff would be able to perform. (AR 21.) Plaintiff has not been under a disability from September 1, 2005 through the date of decision. (AR 22.)

### III.
### LEGAL STANDARD

Congress has provided that an individual may obtain judicial review of any final decision

of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.")

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred by failing to adjudicate a closed period of disability and by failing to articulate clear and convincing reasons for rejecting Plaintiff's testimony. (Plaintiff's Opening Brief 3, ECF No. 15.)

### A.   **Plaintiff's Credibility**

Plaintiff contends that the ALJ did not articulate clear and convincing reasons for rejecting Plaintiff's testimony. (ECF No. 15 at 14.) Defendant argues that the ALJ provided several valid bases for finding Plaintiff's allegations not entirely credible and his reasons are supported by substantial evidence in the record. (Defs. Opp. to Pl's. Opening Br. 21, ECF No. 18.)

Determining whether a claimant's testimony regarding subjective pain or symptoms is

credible requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958.

The ALJ found that Plaintiff had medically determined impairments that could reasonably be expected to cause the alleged symptoms. (AR 18.) However, the ALJ found that Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they are inconsistent with the Residual Functional Capacity assessment. (AR 18.) The ALJ stated that while Plaintiff claims to have disabling depression, Plaintiff has received very limited mental health treatment for his depressive disorder and his symptoms have improved with treatment. (AR 20.) Although Plaintiff's leg was amputated below the knee, he

remains able to stand and walk for four hours in an eight hour day. (AR 20.) Plaintiff's mother stated that he is able to care for his own personal needs. (AR 20.) Plaintiff does chores for his mother, takes her to doctor's appointments, feeds the pets, cooks, does laundry and household repairs, mows the lawn, drives, shops, socializes on the phone and computer, can walk for 20 minutes before needing to rest and is not motivated. (AR 20.) Plaintiff's wide range of daily activities shows an ability to perform a restricted range of light-to-sedentary work. (AR 20.)

### 1. Plaintiff's Mental Impairment

Plaintiff contends that the ALJ erred by finding Plaintiff not fully credible based on his "very limited mental health treatment" and because his mental health improved with medication. (ECF No. 15 at 14-15.) Defendant argues that the ALJ properly considered Plaintiff's lack of mental health treatment and response to medications in considering Plaintiff's allegations that he has disabling mental impairments. (ECF No. 18 at 20-21.)

The ALJ found that Plaintiff was not fully credible because he alleged disabling symptoms of depression, but received very limited mental health treatment and his symptoms improved with treatment. (AR 20.) The ALJ may properly consider that the claimant received only conservative treatment in making a credibility determination. Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008). Substantial evidence in the record supports that ALJ's finding that Plaintiff only received limited and conservative treatment for his mental health impairments.

Although Plaintiff alleged disability due to depression he did not seek any mental health treatment until August 2008. The first mention of depression in the medical record is on June 30, 2008, when Dr. Riffel performed a psychological examination of Plaintiff. (AR 378-82.) Plaintiff reported a history of depression, but denied being depressed. (AR 379.) Plaintiff was oriented to person, place, and time; mood and speech were unremarkable; memory was variable but intact; Plaintiff was able to perform simple two-step commands; concentration and fund of knowledge were good; and insight and judgment were fair. (AR 379.) Plaintiff was not receiving any treatment for mental disorders and his symptoms were in the mild range. (AR 382.)

Dr. Riffel found that Plaintiff's ability to understand, remember and follow very short and

simple instructions was good; ability to maintain appropriate level of concentration, pace, and persistence necessary to perform a one or two step simple repetitive task was fair; ability to relate to others including co-workers, supervisors, or the general public in appropriate manner was fair; ability to tolerate the usual stresses and pressures associated with day to day work activities was fair; and Plaintiff was capable of managing his supplementary funds in his best interest.  (AR 382.)

On August 20, 2008, Plaintiff reported to M. Krenn that he was having worsening symptoms of depression and she prescribed Wellbutrin and exercise.  (AR 413.)  Plaintiff's depression improved on the medication.  (AR 407, 410-12, 478.) On January 15, 2010, Plaintiff reported having worsening thoughts due to the Wellbutrin.  (AR 494.)  On January 20, 2010, Plaintiff was seen at the Behavioral Health Clinic and his medication was changed to Lexapro.  (AR 493.)  Plaintiff's depression improved with the medication.  (AR 481-83.)

On April 5, 2010, Plaintiff complained of a low mood and his medication was increased.  (AR 472.)  On April 14, 2010, Plaintiff complained of a mild depressed mood and denied any problems with concentration or sleep.  (AR 471.)  On May 5, 2010, Plaintiff reported that he was sleeping better and his appetite was good.  His mood was "not much depressed," although he was having some concentration issues.  (AR 468.)  On June 15, 2010, Plaintiff reported improvement of his symptoms on Lexapro.  (AR 363.)

Plaintiff was seen by Dr. Sahota on October 29, 2010, and reported that the Lexapro helped his depression but did not completely resolve all his symptoms.  (AR 519.)  Dr. Sahota found that Plaintiff's mood was depressed with congruent range of affect, speech was normal in rate and tone, thoughts were organized and goal directed, insight and judgment were impaired (ongoing alcohol abuse).  (AR 529.)  Plaintiff was diagnosed with major depressive disorder recurrent moderate without psychotic and had a Global Assessment of Function ("GAF") Score of 50.  (AR 519.)

On November 24, 2010, Plaintiff was seen by a Licensed Vocational Nurse and reported that he did not feel his medication was working to treat his symptoms of depression, but that his sleep and appetite were good.  (AR 518.)  Plaintiff was found to be alert and oriented; thought

1    process was organized; speech was normal in rate and rhythm; and his affect was somewhat flat.
2    (AR 518.) Plaintiff reported a "so-so" mood on December 17, 2010. (AR 517.) On January 24,
3    2013 he reported that his mood, appetite and sleep were fair on the medication. (AR 516.)

4    A condition that can be effectively controlled with medication is not disabling for the
5    purposes of determining eligibility for Social Security Insurance benefits. Warre v.
6    Commissioner of Social Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006). The ALJ properly
7    considered Plaintiff's responsiveness to medication in assessing his credibility. Warn v. Colvin,
8    No. 2:2013 WL 943411, at *15 (E.D. Cal. March 11, 2013).

9    Although Plaintiff argues that his GAF scores show that he did not improve on
10   medication, the ALJ is not required to give controlling weight to the treating physician's GAF
11   score and failing to mention the GAF score would not render the ALJ's assessment deficient.
12   Green v. Astrue, No. 5:10-cv-01294-AJW, 2011 WL 2785741, at *3 (C.D. Cal. July 15, 2011);
13   see Williams v. Astrue, No. 5:08-cv-01378 JC, 2010 WL 147957, at *6 (C.D. Cal. January 11,
14   2010) ("GAF scale does not have a direct correlation to the severity requirements in [the Social
15   Security Administration's] mental disorder listing.") (quoting 56 Fed.Reg. 50746, 50764-65
16   (August 21, 2000)).

17   There is substantial evidence in the record to show that Plaintiff's symptoms were helped
18   by the medication. Also, substantial evidence supports the ALJ determination that Plaintiff's
19   depression was mild. See 20 C.F.R. § 404.1520a(d)(2) (if degree of limitation in the functional
20   areas is none or mild the impairment is generally considered not severe).

21   Finally, at the January 13, 2010 hearing, Plaintiff testified that he is not receiving any
22   mental health treatment because he did not "hit it off" with the psychiatrist so he stopped going.
23   (AR 68-69.) The ALJ may consider the claimant's lack of treatment in making a credibility
24   determination. Burch, 400 F.3d at 681.

25   The ALJ did not err in finding that Plaintiff's allegations of disabling mental impairment
26   were not credible.

27       2.    Ms. Martinez' Third Party Function Report
28   Plaintiff contends that the ALJ erred in making an adverse credibility finding based upon

the questionnaire his mother filled out because it does not address Plaintiff's physical functioning capabilities subsequent to his leg amputation. Defendant argues that the ALJ properly used the third party function report completed by his mother on April 20, 2008, to show that Plaintiff was able to perform a wide range of activities. (AR 315-22.)

In this instance, Plaintiff's left foot was amputated on May 4, 2009, and it would be expected that this functional level would be different at the hearing on January 10, 2010, than on April 20, 2008 prior to the amputation. (AR 315-22.) Further, the April 20, 2008 report is fairly consistent with Plaintiff's function report dated April 8, 2008. (AR 307-314.)

Defendant also contends that Plaintiff's mother's statement that he is not motivated supports the credibility finding. In response to the question if the declarant had noticed any unusual behavior in Plaintiff, his mother responded that he is not motivated. (AR 321.) Ms. Martinez' response is consistent with Plaintiff's complaint that due to his depression he had difficulty getting going and was procrastinating. While Ms. Martinez' statements regarding Plaintiff's physical limitations support the finding that Plaintiff was not disabled prior to the amputation, her statements regarding his condition prior to his amputation should not have been considered in determining Plaintiff's physical limitations following his amputation.

### B. Closed Period of Disability

Plaintiff contends that the ALJ erred by treating the entire period between September 1, 2005 and March 14, 2011 as one homogenous period with no changes in Plaintiff's functional capabilities. (ECF No. 15 at 9.) Plaintiff argues that he is entitled to benefits from at least April 29, 2009, the date that he was admitted to the hospital prior to his leg being amputated, until sometime after June 7, 2010 when he received his prosthesis. (Id. at 9-10.) Defendant concedes that without his prosthesis, Plaintiff would be unable to fulfill the standing and walking requirement of light work. (ECF No. 18 at 14.) However, Defendant argues that the ALJ properly found that Plaintiff retained the functional capacity to perform a reduced range of light work thoughout the adjudicated period.[2] (Id. at 15.)

---

[2] Defendant argues that because Plaintiff did not provide any documentation regarding a coverage dispute and delayed in informing his physician about any alleged dispute, he did not prove that he had a good and acceptable

14

The Social Security regulations contemplate that some applications for benefits would be made after the claimant has recovered from his disability. Moore v. Commissioner of Social Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002); see 42 U.S.C. § 423(f) (setting forth standard by which individual may be determined to not be disabled because the impairment "has ceased to exist, does not exist, or is not disabling. . . .") "In a 'closed period' case, the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision." Mendoza v. Apfel, 88 F.Supp.2d 1108, 1112 (C.D. Cal. 2000) (citations omitted).

While Plaintiff was disabled for some period of time due to his leg amputation, it is not clear how long the disability lasted. Substantial evidence supports the finding that Plaintiff was not disabled prior to the amputation of his leg as he was taking care of the house and yard and was the caretaker for his mother who was incapacitated due to illness. During an examination on December 7, 2007, Plaintiff informed Dr. Martin that he was caring for his parent at home. (AR 353.) On April 15, 2008, Plaintiff stated that he drives his mother around and runs errands for her because she is incapacitated, and takes care of the house. (AR 372.) On June 30, 2008, Plaintiff reported to Dr. Riffel that he was taking care of his mother who has cancer, and was able to prepare light meals and perform light housekeeping, but needed help with heavy tasks. (AR 381.)

At the January 13, 2010 hearing, Plaintiff testified that he had been unable to do any housework since the amputation on May 4, 2009. (AR 70.) Prior to the amputation, he was the caretaker for his mother who is incapacitated. (AR 73.) At the comprehensive orthopedic evaluation on December 14, 2010, Plaintiff stated that one of the reasons that he had not worked is because he has been taking care of his mother for the past four years. (AR 508.) Based upon the record, Plaintiff's period of disability began on April 29, 2009, the date of his hospitalization which resulted in his leg amputation.

When Plaintiff was seen on January 20, 2010, approximately nine months after his

---

reason for his failure to obtain a prosthesis in a timely manner. (ECF No. 18 at 14-15.) However, the ALJ did not articulate this as a reason to deny Plaintiff's benefits. It will be up to the ALJ to determine if this issue should be addressed upon remand.

1  amputation, Plaintiff stated that he was able to clean the house, cook, shop, and was taking care of
2  his ailing mother.  (AR 493.)  At the February 17, 2011 hearing Plaintiff testified that had been
3  unable to do any housework for the last three months, (AR 39), but prior to that he would do the
4  dishes, take out the trash on a daily basis or two to three times a week, (AR 39) would prepare
5  meals, and do his laundry now and then.  (AR 40.)  Plaintiff's neighbors had been doing his yard
6  work for the year.  (AR 40.)  On May 20, 2010, Plaintiff informed M. Krenn that he had recently
7  received his prosthetic device.  (AR 466.)

Plaintiff's period of disability cannot be determined based upon the record, and the Court is unable to determine if Plaintiff's disability would have been for a period of twelve months. Furthermore, while the Commissioner concedes that without his prosthesis Plaintiff would be unable to perform light work, this does not address whether, if Plaintiff's period of disability was for a period of at least a year, Plaintiff would have had the residual functional capacity to perform sedentary work.  See 20 C.F.R. § 404.1567(a).  Accordingly, the Court shall grant Plaintiff's appeal in part and remand for the Commissioner to address the period in which Plaintiff was disabled due to the amputation of his leg.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in finding that Plaintiff's allegations of disabling mental impairment were not credible in determining Plaintiff's residual functional capacity assessment.  However, the ALJ did err by failing to consider whether Plaintiff's disability due to his leg amputation resulted in a closed period of disability that lasted at least one year.  Accordingly,

IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED.  The Court REMANDS this action back to the Commissioner for further administrative proceedings consistent with this opinion.

It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Jeffrey Martinez and against Defendant Commissioner of Social Security.  The Clerk of the Court is

directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **July 26, 2013**

UNITED STATES MAGISTRATE JUDGE